# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DPML JAMISON CORNER, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | C.A. No. 2024-0403 CEB |
| v. | ) | |
| | ) | CONSOLIDATED |
| NEW CASTLE COUNTY, DAVIS CULVER, IN HIS OFFICIAL CAPACITY AS THE MANAGER OF THE NEW CASTLE COUNTY DEPARTMENT OF LAND USE and AARON GOLDSTEIN, IN HIS OFFICIAL CAPACITY AS THE NEW CASTLE COUNTY ATTORNEY, | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

Submitted: September 16, 2025
Decided: November 3, 2025

## <u>MEMORANDUM OPINION</u>

*Upon Consideration of Parties' Cross Motions for Summary Judgment*;
Petitioner's Motion for Summary Judgment is **GRANTED IN PART**.

A. Kimberly Hoffman, R. Eric Hacker, and Alena V. Smith, MORRIS JAMES, LLP, Wilmington, Delaware. *Attorneys for Petitioner.*

Max B. Walton and Lisa R. Hatfield, CONNOLLY GALLAGHER, LLP, Newark, Delaware. *Attorneys for Respondent.*

**Butler, R.J.**

New Castle County, in the heart of the "Northeast Megalopolis," has caught the attention of commercial developers, particularly those interested in building large warehouses and distribution centers. Those seeking to do so must navigate a maze of governmental regulation. This dispute takes us through one such project, inspecting along the way the legal environment surrounding the proposed construction of a two million square foot warehouse just north of Middletown, Delaware.

## Factual Background

In southern New Castle County, a new multi-lane highway, Route 301, has created access to open space within a short distance of I-95 and the cities of the Northeast Corridor. The Plaintiff here, DPML, has proposed the development of two "light industrial structures," or warehouses, adjacent to the interchange at Route 301 and Jamison Corner Road. The proposed two million square feet of enclosed space will operate as a "Logisticenter."[1]

The development of southern New Castle County was not unforeseen; in fact it was recognized as inevitable.[2] To meet the expectation of future development, the

---

[1] Second Am. Compl. ¶ 29 [hereinafter Compl.]. The property is zoned "Business Park," which permits "office, manufacturing, light industrial, warehousing, and uses that support them." New Castle County Unified Development Code §40.02.226 [hereinafter UDC].

[2] Jared Whalen, *What does Delaware's urban growth look like from above?*, DEL. NEWS J., Jan. 13, 2020, https://content-static.delawareonline.com/projects/01-2020-development/index.html; Nick Stonesifer, *Delaware has considered 25k homes since 2021*, SPOTLIGHT DEL., Aug. 6, 2024, https://spotlightdelaware.org/2024/08/06/delaware-housing-market-pace/. *See also* New Castle County Comprehensive Plan 2050, ncc2050.newcastlede.gov.

county and state governments worked in collaboration to plan for the varied interests at play. For our purposes, the two primary legal actors are the New Castle County government and its Uniform Development Code ("UDC") concerning zoning and land use in the county, and the Delaware Department of Transportation ("DelDOT") and its control and management of state roads and highways.

## 1. The New Castle County Unified Development Code

The UDC is not exactly light reading, perhaps no land use code is. It is a 628-page, detailed prescription for all manner of land use in New Castle County. Within this weighty tome, Article 11 concerns us here, because it covers the subject of "transportation impact" of the expected development.

### a. Traffic Impact Studies

All major development plans and rezonings submitted by an applicant must include a "traffic analysis" detailing the potential traffic impacts of the proposed development.[3] If the County and DelDOT agree that the proposed development will generate significant traffic, the analysis may trigger the requirement of a Traffic Impact Study ("TIS").[4] A TIS is a searching review of the roads, intersections, and peak and off-peak hour traffic impact. A TIS may be initiated by DelDOT, a land use agency, or a developer, but DelDOT retains ultimate control over the scope and

---

[3] UDC §40.11.120.
[4] *Id.*

3

requirements.[5]   The TIS results are used by DelDOT to determine necessary transportation network improvements to mitigate traffic impact from proposed development.  If the County and DelDOT determine that a TIS is necessary, one must be submitted and approved by DelDOT before the development plan can move forward with the County.[6]   From oral argument, the Court understands that a TIS requires time and money, and so a developer would prefer to avoid it if possible. One potential alternative to this costly endeavor is the Transportation Improvement District.

### b.  Transportation Improvement District

The UDC also provides that the County and DelDOT may designate a given portion of land in the county as a Transportation Improvement District ("TID").[7]  A TID is "a geographic area defined to secure required improvements to transportation facilities in that area."[8]  A TID involves "the development of a comprehensive and specific plan for land use and transportation within the geographic area of the District" which in turn allows DelDOT and local agencies to "assess developers building in accordance with the plan for the cost of needed transportation improvement in a more comprehensive way than a TIS. . . ."[9]

---

[5] 2 *Del. Admin. C.* §2.2.1 [hereinafter DelDOT Dev. Coord. Manual].
[6] UDC §40.11.120.
[7] *Id.* §40.11.310.
[8] *Id.*
[9] DelDOT Dev. Coord. Manual §2.4.

To create the TID, the County "will enter into an agreement with DelDOT that addresses the initial boundaries and the target horizon year for a TID, and includes any other provision agreed to by the County and DelDOT to implement the TID."[10]

In addition to establishing the TID boundaries, DelDOT is also responsible for creating the TID fund. Developers in a TID are assessed a fee for the expected traffic impact of the planned development and necessary road improvements as determined by DelDOT. DelDOT and the developer sign a "recoupment agreement" whereby DelDOT agrees to undertake whatever road work is needed to mitigate any traffic impact from the project and the developer agrees to write a check to the fund. Thus, the fund replaces the TIS, ensuring that DelDOT has adequate funds to complete any traffic improvements necessitated by new development.

When a proposed development project is located in a TID, it may be exempted from the requirement of providing a TIS to the County as part of the approval process. The approval process begins with a plan submission to the County Department of Land Use ("Department"). An applicant of a major development is required to submit certain traffic information and if DelDOT and the Department find that the traffic impact will be significant, then a traffic impact study may be

---

[10] UDC §40.11.310(b).

required.[11]  However, the requirement of a traffic impact study "will be waived provided the Department finds:

> C. The proposed development is located within and has trip generation consistent with a TID . . . ."[12]

With these legal arrangements in mind, we can move on to the history of the instant dispute.

### 2.  The Progression of the DPML Plan

#### a.  *The Parties Sign the TID Agreement*

DPML submitted its development plan ("the Plan") for the Logisticenter to the Department in June 2021.[13]  There is no dispute that the land in question lies within the Southern New Castle County TID ("SNCC TID"), that DelDOT administers the SNCC TID, and that the parties memorialized all of this in a written, recorded "TID Agreement" while the Department was conducting its review of the Plan.[14]  The TID Agreement is exquisitely clear that the agreement was intended to

---

[11] *Id.* § 40.11.120.
[12] *Id.* §40.11.121.
[13] At this time, the property was owned by DPML's predecessor in title.  The Court understands the predecessor was responsible for ensuring that the property could be used for DPML's Plan as a condition of sale.  At the time of execution, all parties signing the TID Agreement were aware of DPML's Plan and specifically that it would be a Logisticenter warehouse.  Oral Arg. on Sept. 16, 2025, at 33:37-34:30.
[14] Compl., Ex. 7.

waive a traffic impact study in exchange for DPML's participation in the TID and contribution to the SNCC TID fund.[15]

### b. *The County reviews the DPML Plan*

After DPML submitted its Plan to the Department, the Department spent two years reviewing the Plan for UDC compliance. During that time, DPML, DelDOT and the County executed the TID Agreement discussed above and DelDOT issued a Letter of No Objection, approving the plan.[16] In November 2023, the Department completed its review and certified the Plan as UDC compliant.

At this point, the UDC comes back into play. When a major development plan is certified complaint with the UDC by the Department, it is forwarded to the County Council and the Council has two options. It may 1) adopt a resolution approving the plan, or 2) refer the matter back to the Department, *no more than twice*, for answers to specific questions.[17] The latter is what happened here.

County Council reviewed the Plan and in December 2023, referred the Plan back to the Department with seven questions regarding compliance. The

---

[15] *See id.* at 1 ("DelDOT shall set up a fund . . . to help fund the planned transportation improvements in lieu of preparing a traffic impact study . . . ."); *id.* at 2 ("In accordance with the aforesaid Section 40.11.121(C), and in light of the area wide studies performed by DelDOT, Property Owners shall not be required to perform traffic impact studies and, in lieu thereof, shall contribute to the SNCC TID Fund."); *id.* at 6 ("No Individual Traffic Study- No Individual Traffic Study will be required as a separate cost for individual developments participating in this agreement, as a condition of approval by DelDOT or NCC.").

[16] Compl., Ex. 7.

[17] UDC §40.31.114(D)(1)(b).

Department conducted another round of review, answered all of Council's questions and again certified the Plan as compliant, sending it back to the Council.

Council referred the Plan back to the Department a second time, asking three questions. This is where something got stuck. The third question inquired into "the actual data showing traffic impact results, stemming from the area wide studies by DelDOT relating to the Plan" and "the traffic capacity data for the roads and intersections. . . ."[18]

There followed a long silence. Three months after the second referral, Plaintiff contacted the Department seeking a response to the second referral from Council.[19] The Department did not respond. While the second referral was pending with the Department, Plaintiff and DelDOT executed the Recoupment Agreement.[20] The nearly $6 million Recoupment Agreement reflected the fee DelDOT assessed for DPML's contributions to the TID fund. Still, the Department was silent, and the Plan was withheld from Council for approval. Then the lawsuits started.

### c. The Lawsuits

Plaintiff filed in Superior Court seeking a Writ of Mandamus to force the Department to answer the questions raised by Council in its second referral. It also

---

[18] Pet'r's Opening Br. Partial Summ. J., at 15.

[19] In a touch of irony, the substance of question number three was answered by DelDOT – and not the Department - separately in correspondence directly to Councilman Carter shortly after he asked the Department. DelDot indicated that studies needed to plan for 2040 infrastructure improvements were underway, but incomplete. Compl. ¶109.

[20] Compl., Ex. 21.

filed in the Court of Chancery seeking to maintain the status quo and prevent the Plan from expiring as a matter of law.[21] While the County agreed to the status quo order sought in the Chancery Court case, in the Mandamus action in Superior Court the Department asserted *for the first time* that DPML must provide a Traffic Impact Study to proceed.[22]

Finally, DPML, uncertain whether the County might take the position that the Department's decision to now require a TIS was one subject to review only by the Zoning Board of Adjustment ("the Board"), took an administrative appeal to the Board. The Board ruled in favor of the County – that is, that the Department *could* condition approval of the Plan on provision of a new TIS. DPML filed an appeal to Superior Court of that decision as well.[23]

Thus, three lawsuits have now been consolidated and the parties, thankfully, have distilled the dispute into two questions: 1) whether New Castle County can condition approval of the Plan on submission of a traffic impact study, and 2) whether, under Title 9 of the Delaware Code, DPML's development plan is "deemed approved" as a matter of law.[24] The parties believe that with the guidance of

---

[21] *See* UDC §40.31.390 (requiring a Plan to reach recordation within 36 months after receiving an exploratory plan initial report).
[22] *See* C.A. No. N24M-04-059, Resp't's Answer to Pet'r's Pet. Writ of Mandamus, D.I. 11. *See also* Compl., Ex. 22 [hereinafter Dep't's June 4th Letter].
[23] C.A. No. N25A-02-004, New Castle County's Opp'n. to Pl.'s Mot. Consolidate, D.I. 14, Ex. 1.
[24] Order Governing Cross-Motions Summ. J.

responses to these questions, the remaining issues can be resolved without further pleadings to the Court. If only…

**ANALYSIS**

**1. The TID Agreement Waives the County's Right to Require a TIS**

The legal relations here are controlled by the TID Agreement. The contract is signed by DelDOT, the County and DPML. By the terms of the contract, neither the County nor DelDOT can require a TIS, as a TIS was specifically waived under the Agreement. Rather, to the extent the warehouse project had a traffic impact, mitigation of the impact would be handled by the fund administered by DelDOT. This is not a matter of interpretation of vague, ambiguous words: it is likely the *sine qua non* of the TID Agreement in the first place.[25]

For most of the history of this dispute, the County did not disagree. Once the TID Agreement was signed, DelDOT approved the project and executed the Recoupment Agreement in lieu of a TIS, just as the TID Agreement called for. The Department approved the project and sent it along to County Council for approval. Council sent it back to the Department a first time with seven questions, one of which was whether the Plan "is technically compliant with the Southern New Castle County Traffic Improvement District?"[26] The Department answered "Yes, the

---

[25] *See supra* note 15.
[26] Compl., Ex. 8.

subject plan is compliant with the Southern New Castle County Transportation Improvement District as confirmed by DelDOT. Surrounding area development/growth was included in recent updates to the SNCC TID analysis."[27] In response to a different question, the Department stated that "Section 40.11.120 of the UDC (requiring a TIS) is not applicable because the plan is located within the SNCC TID *and has a trip generation consistent with the TID*."[28]  This was the Department's stated position as of December 7, 2023.

The Department got a second referral back from Council.  None of Council's questions in the second referral questioned the Department's previous response about the need for a TIS.  Rather, months later, apparently out of the blue, the Department unilaterally decided that the Project needed a TIS.  This reversal of positions is not only factually inexplicable, it is legally indefensible.

## 2. The County Cannot Now Modify the Terms of the TID Agreement so as to Vitiate its Principal Purpose

The County's argument in defense of this sudden and radical change of position relies on a single clause in the UDC.  We have quoted it earlier but will do so again.  Section 40.11.121(C) says that a TIS will be waived

*provided* the Department finds:

---

[27] Compl., Ex. 9.
[28] *Id.* (emphasis added).

11

C. the proposed development is located within *and has trip generation consistent with a TID* or a CCD and meets the criteria established in Division 40.11.300.

Three different traffic studies found that the Plan had trip generation consistent with the TID: one commissioned by the Department itself, one by DelDOT, and one by DPML.[29]  None of these reports concluded that the DPML Plan was not consistent with the TID.

Further, DelDOT, the subject matter specialist on traffic impact, has not withdrawn its Letter of No Objection to the planned development.  There is nary a whimper from DelDOT that the TID fund cannot handle the traffic impact from the development.  In this case, DelDOT approved the plan and assessed the developer as per the TID agreement.  It is at least ironic that now, despite approval by DelDOT concerning the traffic impact, the Department – whose expertise is in zoning and land use – has decided that the traffic impact is a debilitating concern.

So, on what basis does the Department justify its reversal now?  The Department admits that it "typically relies on a determination from DelDOT that projects and plans are consistent with the trip generation in the TID" and that "the UDC does not specifically address what it means to have a trip generation consistent with a TID."[30]   Nonetheless, the Department contradicted DelDOT, and

[29] Pet'r's Opening Br. Partial Summ. J., at 17.
[30] Dep't's June 4th Letter.

12

its own previous determination of compliance, after suddenly discovering that the TID had not been updated with new information contained in a 2013 traffic analysis study.[31]

According to the County, "there was evident confusion among DelDOT, Dermody (DPML), and various consultants related to the pending but not yet approved TID update."[32] It claims that each of the three traffic studies, including its own, "incorrectly assumed that the SNCC TID had been updated" when it had not.[33] So, who bears the risk of these incorrect assumptions?

The Court has little patience for a public entity that seeks to amend the terms of a contract with a private party by relying on a hitherto unheralded clause in its enabling legislation. An incorrect assumption regarding the TID is not a risk assigned to DPML under the TID or the Agreement; nor is it one to address *after* the County has waived its right to require a TIS. Having executed a contract that is quite clear on its face, the County cannot retract its waiver of a TIS because it failed to update the TID and made an incorrect assumption.

---

[31] *Id.*

[32] Resp't's Reply Br. in Supp. Mot. Summ. J., at 23. The Department admits that it has not required a TIS of previous projects similarly not included in the 2013 study. Dep't's June 4th Letter. In fact, it has never required a TIS of any project so long as it was located in the TID, suggesting that that the 2013 study has never been the basis for determining TID compliance. Compl. ¶¶170-72.

[33] Resp't's Answ. Br. Opp'n. to Pet'r's Mot. Summ. J., at 8.

So as to Question Number 1 posed by the parties: may the County condition approval of the plan on a traffic impact study under the particular facts of this case, the Court concludes that the answer must be in the negative.

## II. The Court Will Not Reach Question Number 2 as it Unnecessary to Resolution of the Dispute

After many pretrial pleadings, the parties agreed that the most important questions requiring resolution were the two posed earlier. The second question asked: whether, under Title 9 of the Delaware Code, DPML's development plan is "deemed approved?"[34]

Strong reasons for and against the positions of the parties have been advanced. Some arguments rely upon state law and others on the UDC. To take but one example, there is a dispute over state law, 9 *Del. C.* §1309, which requires that Departments or Planning Boards "act" within 45 days of receipt of a "matter required to be submitted" or approval "shall be presumed" unless "a longer time shall have been allowed by the County Council." As detailed above, the Department took a good bit longer to respond to the County Council's second referral back to the Department with further questions concerning the project. Are questions from Council matters "required to be submitted" to the Department? What answer is

---

[34] Order Governing Cross-Motions Summ. J.

"presumed" if the Department takes more than 45 days? Did the Council effectively allow a longer time by not complaining?

Sorting out these sub-questions may unwittingly result in rulings affecting other activities of Departments and Boards beyond the issue before the Court. Whether the plan is "presumed approved" by operation of law or "approved" under the normal procedural rules of the UDC is of no moment. Counsel for the County indicated at oral argument that the County understands the consequences that flow from an adverse ruling on the first question. The Court much prefers that the process proceed with regular order and that judicial intervention concerning approval is unnecessary.

The parties shall confer upon a form of order consistent with this opinion and submit it within 15 days. The parties should further advise the Court on any issues needing resolution by the Court for final disposition. The Court will retain its legal and equitable authority to assist with any further rulings as necessary.

**IT IS SO ORDERED.**

**/s/ Charles E. Butler**
Charles E. Butler, Resident Judge
